In the Matter of the ESTATE of Erick RASK, Deceased.

Myrtle ATHEY, Appellant,

v.

Theodore RASK et al., Appellees.

Civ. No. 8915.

Supreme Court of North Dakota.

Feb. 1, 1974.

C. J. Schauss, Mandan, for appellant.

Richard P. Gallagher, Mandan, for appellees.

PAULSON, Judge.

This is an appeal from a judgment of the Morton County District Court affirming a decree of the County Court of Mor-

ton County which denied admission to probate of the purported Last Will and Testament of Erick Rask, Deceased. This is the second time this case has been before this court. In re Rask's Estate, 177 N.W.2d 287 (N.D.1970).

In April of 1967, Theodore C. Rask, the executor of the estate of Erick Rask, filed a petition in Morton County Court for the proof and probate of the will of the deceased, Erick Rask. On May 24, 1967, an answer and objections to the probate of that will was filed in Morton County Court by the various brothers, sisters, nephews, and nieces of Erick Rask. The contestants to the will claimed that Erick Rask did not have sufficient mental capacity to make and execute a will. On January 23, 1968, the Morton County Court held that the deceased, Erick Rask, lacked testamentary capacity at the time of the execution of his will because he was suffering from insane delusions. On January 27, 1968, the Morton County Court issued its judgment and decree denying probate to the will of Erick Rask.

On February 28, 1968, Myrtle Athey, the sole beneficiary of the will of Erick Rask, filed a notice of appeal from the county court's decision to the District Court of Morton County. On June 19, 1972, the district court entered its order for judgment which affirmed the Morton County Court. On August 17, 1972, Myrtle Athey filed her notice of appeal to this court.

We consider the Statement of Facts prepared by the district court to be exhaustive and adopt it as our own. Those facts, as stated by the district court, are:

"The court has examined and considered this record and finds and determines that the material facts are:

"(1) That E. R. Rask, the decedent, was born March 6, 1889 in Sweden;

"(2) That he came to this country with his parents while a child and lived with them on a farm in Morton County during his minority;

"(3) That in the spring of 1910, when he was about 21 years of age and living with his parents on their farm, he was injured by a stroke of lightning, as a result of which he became feeble-minded;

"(4) That on July 4, 1910 he was committed to the State Hospital at Grafton and was discharged therefrom June 20, 1911;

"(5) That on October 14, 1914, upon due notice and hearing, he was found to be insane and was committed to the State Hospital at Jamestown;

"(6) That the examining physician found, among other things:

"(a) That he was struck by lightning in 1910 and has been peculiar ever since; and

"(b) That he claimed he had a wife and a family, which is a false delusion;

"(7) That on June 5, 1916 he was discharged from the State Hospital and was restored to competency by the county court of Morton County;

"(8) That he entered the military service in 1918; that he served about one year in World War I and was discharged in August of 1919;

"(9) That in October, 1924, upon due notice and hearing, he was found to be mentally deficient and incompetent to manage his own property; and thereupon the court appointed H. M. Johnson as general guardian of his person and estate, who qualified and served as such until the time of his death in July, 1956;

"(10) That after the death of H. M. Johnson, J. R. Madsen was appointed as his general guardian on July 25, 1956 and served as such guardian until April 11, 1967, when the testator died;

"(11) That on May 26, 1966 Clarence Schauss prepared the last will and testament here in issue for Eric Rask, which was duly signed by the testator in the

presence of two subscribing witnesses and who signed their names thereto in the presence of the testator and in the presence of each other, by the terms of which he provided:

"(1) That all his debts be paid;

"(2) Gave his automobile, if any he had, to his nephew, Theodore C. Rask;

"(3) Gave, devised and bequethed [*sic*] all the rest, residue and remainder of his estate, real or personal, to his *daughter*, Myrtle Athey, as her sole property absolutely; and

"(4) Appointed Theodore Rask as his executor;

"(12) That Eric Rask purchased an automobile during the last year or two of his lifetime but when he was unable to obtain a driver's license he sold it; and consequently Myrtle Athey became the sole beneficiary of his entire estate;

"(13) That J. R. Madsen filed his final report and account as general guardian of said ward on July 25, 1966, which disclosed that his estate at that time consisted of:

"(1) U.S. 'E' and 'H' Savings Bonds, $48,000.00; and

"(2) Cash, $1112.29, a total of $49,-112.29;

"(14) That after the death of the testator the interested parties found about $22,200.00 in currency in a fishing tackle box in the apartment which he occupied at the time of his death;

"(15) That the executor named in the will filed an inventory and appraisement in the county court showing cash assets in the sum of $71,321.35;

"(16) That Myrtle Athey was born to Mr. and Mrs. John Hirschkorn at Hebron, North Dakota on the 3rd day of August, 1903 and that Eric Rask, at that time, was 14 years, 5 months and 3 days of age;

"(17) That Myrtle's mother passed away and that thereafter, on September 30, 1912, she was adopted by Mr. and Mrs. Nicholas Freeberg, a sister of the testator;

"(18) That Myrtle Athey met the testator while he was living with his parents on their farm in Morton County, when she was about five years of age and he was then a young man of about nineteen years of age;

"(19) That Myrtle visited in the home of Eric's parents a few times during the years 1908 and 1909;

"(20) That Myrtle left for Washington, D.C. in 1922. She married thereafter, moved to St. Petersburg, Florida, and did not see Eric from about 1910 until 1960, or for a period of about fifty (50) years, when she returned to Bismarck upon the illness of her adoptive mother;

"(21) That Myrtle saw Eric the next time in 1965, when she visited him in Mandan. She claims that at that time he showed her a little black book which had notations of from $40,000.00 to $50,000.00 in it, but that he did not tell her that he had a large sum of currency in his apartment;

"(22) That, although Eric never came to see her while she was living in Washington or Florida, she claimed that he was normal, that he thought well of her and wrote her occasionally and sent her presents in the form of small amounts of currency;

"(23) That Eric falsely believed that someone had gotten away with several thousand dollars worth of his liberty bonds;

"(24) That Eric also claimed that somebody had gotten away with some of the money received from the farm;

"(25) That Eric falsely *believed he was married*, that he had a wife, and that Myrtle Athey was his daughter;

"(26) That in fact and truth, Eric was never married and that Myrtle Athey is not his daughter, as he falsely believed she was;

"(27) That he instructed his attorney to leave his entire estate, except his automobile, if he had one, to his *daughter*, Myrtle Athey, as shown by his notation in evidence, Appellee's exhibit 'A'." [Emphasis by district court.]

From these facts the district court found that the deceased, Erick Rask, was suffering from or afflicted with an insane delusion that he was a married man and had children; that he had been adjudged insane in 1914; that in truth and in fact Erick Rask was never married; that he had no children; that Myrtle Athey was not his daughter; that Erick Rask was unquestionably motivated by and was acting under the influence of such insane delusion when he executed his will making Myrtle Athey his sole beneficiary; and that the will was a direct offspring, product, or result of the insane delusion and controlled the disposition of his property.

From its findings, the district court concluded:

"The court concludes and determines, therefore:

"(1) That Eric Rask, the testator, did not have testamentary capacity when he made his will on May 26, 1966;

"(2) That the last will and testament of Eric Rask here in issue is null and void for want of testamentary capacity;

"(3) That said purported last will and testament of Eric Rask is not entitled to be admitted to probate;

"(4) That the contestants have sustained the burden of proof by a fair preponderance of the evidence on the material issues set forth herein; and

"(5) That the order and decree of the county court of increased jurisdiction of Morton County determining: (1) That the will here in issue was null and void for want of testamentary capacity; and (2) That it be denied admission to probate; is sound and correct, sustained by sufficient evidence and supported by ample authority; and therefore the same is hereby affirmed."

Myrtle Athey appeals from the district court's judgment and sets forth the following issues for review:

"1. Did Erick Rask, the decedent, have testamentary capacity to execute his will on May 26, 1966.

"2. Was Erick Rask suffering from an insane delusion within meaning of law at the time of execution of said Last Will and Testament.

"3. If the answer to the above was affirmative, was the Last Will and Testament of decedent the product of that delusion and did the testator devise his property in a way which, except for that delusion, he would not have done."

 In Kingdon v. Sybrant, 158 N. W.2d 863 (N.D.1968), we held, in paragraphs 1 and 2 of the syllabus:

"1. There is a presumption that a testator was sane at the time of the execution of his will, until the contrary appears by competent proof, and where one is contesting proof of a will on the basis that the testator was suffering from an insane delusion, it is not sufficient to introduce evidence which tends to prove that the testator was possessed of such a delusion, but there should be further proof by the contestant that such delusion has no foundation in fact or in probability in order to show that the delusion is wholly a product of the imagination.

"2. Whether a testator is laboring under an insane delusion which materially affects the will is generally a question of fact, and to defeat a will on the ground that the testator lacked testamen-

tary capacity because of an insane delusion, it is not sufficient to establish that the testator was the victim of such a delusion, but the evidence must go further and establish that the will itself was the product of that delusion and that the testator devised his property in a way which, except for that delusion, he would not have done."

From the *Kingdon* case, it is evident that the question of whether a testator is laboring under an insane delusion which materially affects the will is a question of fact. The instant case was tried to the court without a jury and, therefore, the district court's findings of fact will be governed by Rule 52(a) of the North Dakota Rules of Civil Procedure, which provides, in pertinent part:

"Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. . . . If an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact and conclusions of law appear therein."

In 1914, Erick Rask, the testator in this case, was found to be insane by the insanity board of Morton County, on the ground of his belief that he was married and the father of a child, neither of which was true. Thereafter he was committed to the State Hospital in Jamestown, where the examining physician reported that Erick Rask was laboring under the false delusion that he had a wife and family. The examining physician also found that Erick Rask's mental frailties were apparently precipitated in 1910 from the effects of a bolt of lightning which struck near him. During the year and a half that Erick Rask spent at the State Hospital, it is reasonable to assume that he received treatment for the delusion from which he suffered.

In 1924, after having served in the Armed Forces, Erick was placed under guardianship, and he remained under guardianship until his death on April 11, 1967.

When Erick caused his will to be written, he told the scrivener to leave the bulk of his property to his "daughter", Myrtle Athey. This desire on Erick's part made it apparent that the treatment he had received at the State Hospital had not been successful, and that Erick had been laboring under the same delusion of fatherhood for about fifty-two years.

The rule is well established that a single person may leave his property to whom he chooses, and that brothers and sisters are not natural objects of a testator's bounty. In re Bratcher's Estate, 76 N.D. 194, 34 N.W.2d 825 (1948). See Stormon v. Weiss, 65 N.W.2d 475 (N.D.1954). If Erick Rask had had a longstanding and close relationship with Myrtle Athey and if such relationship had been on a continuous basis —instead of involving a fifty-year break as it does in this case—then we would have no difficulty in understanding that Erick would desire to will his property to her. The circumstances of this case, however, make it evident that Erick believed that he was the father of Myrtle Athey, and that, by his will, he disposed of the bulk of his property to her because of that belief.

The evidence in this case clearly establishes that there was no factual basis for Erick's belief that Myrtle Athey is his daughter. We believe that the evidence fails to establish even a probability of Erick's fatherhood, because, at the time Myrtle Athey was born, Erick was fourteen years and five months of age. Myrtle Athey was born in Hebron, and prior to and at the time of her birth, Erick was living with his parents on a farm south of Mandan. The record discloses that at the time of Myrtle's conception Erick had no opportunity to associate with Myrtle's mother.

In Kee v. Redlin, 203 N.W.2d 423 (N.D.1972), we held in paragraph 5 of the syllabus:

"The scope of review on appeal of the findings of a trial court is limited under Rule 52(a), N.D.R.Civ.P., to a determi-

nation of whether the findings are clearly erroneous, giving due regard to the opportunity of the trial court to judge the credibility of the witnesses. Therefore we give great weight to the findings made and the inferences drawn by the trial court from the evidence adduced at the trial. Applying this rule we cannot say that the findings of the trial court are clearly erroneous."

In this, as in all trials, the trial court has the opportunity to judge of the credibility of the witnesses on a firsthand basis. The trial court's findings, inferences, and conclusions are based on such firsthand knowledge, and we therefore give great weight to those determinations. In our perusal of the record in the instant case, unless we can say from the evidence that the trial court's findings are clearly erroneous, we cannot set those findings aside under our Rule 52(a), N.D.R.Civ.P.

Applying this rule to the case at bar, we are unable to say that the findings of fact made by the trial court are clearly erroneous.

The judgment of the district court is, therefore, affirmed.

ERICKSTAD, C. J., and TEIGEN, VOGEL and KNUDSON, JJ., concur.